[No. D040569. Fourth Dist., Div. One. Apr. 17, 2003.]

SCRIPPS CLINIC, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
PATRICIA THOMPSON et al., Real Parties in Interest.

918

## COUNSEL

Barton H. Hegeler, Eugene A. Patrizio and Storm P. Anderson for Petitioner.

No appearance for Respondent.

Clark & Associates, R. Craig Clark and Adriana Suarez for Real Parties in Interest.

Robert C. Fellmeth and Juilanne D'Angelo Fellmeth for Center For Public Interest Law as Amicus Curiae on behalf of Real Parties in Interest.

## OPINION

**O'ROURKE, J.**—Patricia Thompson (Patricia) and George Thompson (collectively the Thompsons) contracted for medical insurance with Health Net and chose Scripps Clinic (Scripps) as their medical group. After the Thompsons filed a complaint alleging medical malpractice against two physicians affiliated with Scripps, Scripps informed the Thompsons that it was exercising its right under its contract with Health Net to have Health Net transfer the Thompsons to another medical group. Health Net transferred the Thompsons to University of California at San Diego Health Network (UCSD). The Thompsons then filed this lawsuit, contending that Scripps's policy of terminating medical care for patients who file lawsuits against its physicians is illegal.

Scripps contends summary adjudication should have been granted as to: (1) the intentional interference with contract cause of action because there was no interference with the Thompsons' contract with Health Net and because Patricia's treating physicians were not third parties to that contract; (2) the negligent infliction of emotional distress and breach of fiduciary causes of action because Scripps breached no duty; (3) the Unruh Civil Rights Act (Civ. Code, §§ 51, 52) cause of action because litigants are not a protected class; (4) the Cartwright Act (Bus. & Prof. Code, § 16720) cause of action because there was no unlawful trust between Scripps and Health-Net; (5) the unfair competition (Bus. & Prof. Code, § 17200) and breach of public policy causes of action because a patient's right to sue does not supercede a physician's right to withdraw from a patient's care; and (6) punitive damages under Code of Civil Procedure section 425.13. We grant the petition as to the Unruh Civil Rights Act, the Cartwright Act, the unfair competition and the breach of public policy causes of action and as to punitive damages. We deny the petition as to the other causes of action.

FACTUAL AND PROCEDURAL HISTORY

Scripps is a group medical practice governed by a group of physicians who represent Scripps's physicians. The governing physicians established a policy to terminate further medical care for all patients and their families upon the receipt of an intent to sue letter. However, Scripps will not terminate care for a patient unless it determines that (1) another medical care system can duplicate the services Scripps has been providing and (2) the transfer would not jeopardize the patient's care, given the patient's current medical state.

Scripps initiated this policy because a lawsuit "irreparably compromises the physician-patient relationship, thereby potentially compromising the care rendered to the patient." Patient-litigants might "not be as forthcoming for fear that evidence—or information would be used in their lawsuit." Further, patient litigants' sense of what is important to communicate to other Scripps physicians could be colored by the lawsuit, making it difficult for the physician to determine what is "true and unbiased." Patients may also believe that other Scripps physicians will not give them balanced care. For example, a patient may believe that a physician who does not timely return a telephone call is punishing the patient. Continuing the physician-patient relationship might also put a physician in the awkward position of testifying against a colleague.

On March 17, 1999, Patricia was in a serious accident. At the time, Scripps provided medical care to the Thompsons through their health insurance provider, Health Net. Alleging negligent treatment of Patricia's broken clavicle, the Thompsons filed a medical malpractice claim against Dr. Roger Thorne and Dr. Michelle Carpenter, both of whom were affiliated with Scripps. At the time the malpractice action was filed, Patricia was no longer being treated by Drs. Thorne and Carpenter, but was being treated by other Scripps physicians: Dr. Michael Botte and Dr. Jan Froenke for the broken clavicle, and Dr. Kelly Harkey for endometriosis.

On June 14, 2000, Myrna Binford, a Scripps employee, sent the following letter to the Thompsons: "Scripps Clinic Medical Group has been notified of the legal action you have taken against the group. Because of this legal action, Scripps Clinic is requesting that Health Net immediately terminate you with Scripps Clinic and transfer your membership to another medical group. [¶] Please contact Health Net's Member Services at 800-641-7761 for assistance in selecting a new medical group in your area. Your transition to a new group should occur by 7/1/2000. In the interim, the Urgent Care Center at the Torrey Pines campus is open from 7:00 a.m. to 10:00 p.m.

daily and the Urgent Care Center at Rancho Bernardo is open from 9 a.m. to 9 p.m. for your urgent/emergent needs. Your primary care physician can provide medically indicated prescription refills during this time. [¶] Your prompt attention and cooperation in this is greatly appreciated."

When Patricia received Bindford's letter, she immediately requested Health Net reassign the couple to a new medical group. Health Net transferred the Thompsons to UCSD, effective July 1, 2000. As the result of Scripps's actions, Patricia had to cancel a follow-up visit with Dr. Harkey that had been scheduled near the end of June even though Patricia was still suffering severe pain and bleeding. Before Patricia could be referred to a new gynecologist at UCSD, she had to schedule a visit with her new primary care physician and receive authorization. Patricia's care was also delayed until UCSD received her medical records from Scripps.

The Thompsons sued Scripps and Binford for damages arising from the termination of care. The third amended complaint, which is the operative complaint, includes causes of action for tortious interference with contractual relations, negligent infliction of emotional distress, violation of the Unruh Civil Rights Act; breach of fiduciary duty; unfair competition; breach of public policy; and violation of the Cartwright Act. In addition to other forms of relief, the Thompsons sought punitive damages.

On March 8, 2002, Scripps moved for summary judgment or, in the alternative, summary adjudication. On the same day, the Thompsons moved for summary adjudication of the Unruh Civil Rights Act, Cartwright Act, unfair competition and breach of public policy causes of action. On June 1, 2002, the court issued its tentative ruling in which it granted Scripps's motion for summary judgment as to Binford but did not grant summary adjudication of any causes of action as to Scripps. The court also denied the Thompsons' motion for summary adjudication. After oral argument, the court adopted the tentative ruling as its final order.

### DISCUSSION

We may review an order denying a motion for summary judgment or for summary adjudication by petition for a writ of mandate. (Code Civ. Proc., § 437c, subd. (*l*).) We may issue a writ of mandate to prevent trial of nonactionable claims after the trial court erroneously denies a motion for summary adjudication. (*Travelers Casualty & Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440, 1450 [75 Cal.Rptr.2d 54].) We review de novo the trial court's decision to grant summary adjudication and are not bound by the trial court's stated reasons or rationales. (*Ibid.*)

■ "[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Additionally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Ibid.*) The movant meets its burden by presenting evidence in the form of " 'affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice' must or may 'be taken.' " (*Id.* at p. 855; Code Civ. Proc., § 437c, subd. (b).) If the movant meets its burden of production, the movant "causes a shift, and the opposing party is then subjected to a burden of production of [its] own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co., supra,* at p. 850.)

## I. *Interference with Contractual Relations*

■ We reject Scripps's contention the court should have granted summary adjudication of the intentional interference with contractual relations causes of action. In the third amended complaint, the Thompsons alleged Scripps disrupted their contractual relationship with Health Net and their contractual relationship with their treating physicians. The court declined to grant summary adjudication because Scripps's moving papers did not address the issue of interference with the Thompsons' relationship with their treating physicians. Although Scripps contended in its reply that it could not interfere in the Thompsons' relationship with their treating physicians because those physicians were employees of Scripps, the court found the evidence Scripps cited did not show that the treating physicians were Scripps employees.

We first note that the Thompsons allege two separate causes of action for intentional interference with contractual relations because they allege that Scripps interfered with two separate and distinct contracts: one with Health Net and the other with their treating physicians. ■ When plaintiffs allege "that the defendant's single wrongful act invaded two different primary rights, he has stated two causes of action, and this is so even though the two invasions are pleaded in a single count of the complaint." (*Skrbina v. Fleming Companies* (1996) 45 Cal.App.4th 1353, 1364 [53 Cal.Rptr.2d 481] [relying upon *Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1854-1855 [16 Cal.Rptr.2d 458]].) ■ In its moving papers, Scripps ignored the Thompsons' cause of action for intentional interference with the contractual relationship with their treating physicians. The court

ignored the Thompsons' cause of action for intentional interference with the Health Net contract. We review each of these causes of action separately.

The elements of the cause of action of intentional interference with contractual relations are " '1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.' [Citation.]" (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55 [77 Cal.Rptr.2d 709, 960 P.2d 513].) "Wrongfulness independent of the inducement to breach the contract is not an element of the tort . . . ." (*Ibid.*) Further, the tort "does not require that the actor's primary purpose be disruption of the contract." (*Id.* at p. 56.)

Scripps contends that it could not interfere in the contractual relations between the Thompsons and their treating physicians, who are employees of Scripps, because a party to a contract cannot tortiously interfere with that contract. (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515 [28 Cal.Rptr.2d 475, 869 P.2d 454].) Scripps failed, however, to address this cause of action in its moving papers. It did not, therefore, list the employee status of the treating physicians on its separate statement of undisputed material facts. " 'This is the Golden Rule of Summary Adjudication: if it is not set forth in the separate statement, *it does not exist.* Both the court and the opposing party are entitled to have all the facts upon which the moving party bases its motion plainly set forth *in the separate statement.*' [Citations]" (*United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 337 [282 Cal.Rptr. 368]; see also *North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 31 [21 Cal.Rptr.2d 104].)

Scripps tried to remedy its failure in its reply brief by relying upon the separate statement of undisputed material facts supporting the Thompsons' motion for summary adjudication, which stated that Patricia was being treated by three "Scripps Clinic doctors" and that "[t]here are over 325 doctors at Scripps Clinic Medical Group." These facts do not establish that the relationship of the treating physicians to Scripps is one of employee-employer. The trial court correctly found that Scripps failed to meet its burden of production of evidence.

Scripps also contends its termination of medical care for the Thompsons did not disrupt the Thompsons' relationship with Health Net because (1) the Thompsons agreed to be bound by the terms and conditions of Health Net's contract with Scripps and (2) the Thompsons' contractual relationship

with Health Net was not disrupted. Scripps states, "[P]laintiffs cite no authority for the proposition that as members of Health Net, they did not agree to be bound by the terms and conditions Health Net has set for its providing medical groups." However, as the movant, Scripps—not the Thompsons—has the burden of production. Scripps introduced no evidence that the terms and conditions of its contract with Health Net were incorporated in the Thompsons' contract with Health Net.

We reject Scripps's argument that the summary plan description of Health Net's plan (SPD) includes a provision implying that a medical provider can terminate a patient who files a lawsuit. Under the SPD, a patient can be terminated for refusing to follow treatment, for disruptive behavior, for failure to pay, and for misrepresentation or fraud. Scripps contends Health Net, which has "discretionary authority to interpret the benefits of this Plan," has interpreted the term "disruptive behavior" to include filing a lawsuit. The Health Net PPG Operations Manual, which governs the contractual relationship between Scripps and Health Net, states that a patient may be terminated for one instance of the following behavior: fraud, disruptive or abusive behavior, dangerous behavior, and receipt of a notice of intent to sue. In this list, a notice of intent to sue is not listed as a form of disruptive behavior, but rather as another type of behavior warranting termination. Therefore, Scripps's evidence does not support its contention that Health Net interpreted the term "disruptive behavior" in the SPD to include filing a lawsuit. Because Scripps failed to meet its burden to produce evidence that the terms and conditions of its contract with Health Net were incorporated into the Thompsons' contract with Health Net, Scripps did not make a prima facie case, and the burden of production did not shift to the Thompsons.

Scripps also relies on the following undisputed fact: "At no time were Plaintiffs' insurance benefits provided to them by Health Net interrupted." Although the Thompsons did not dispute this fact, they raised a triable issue of fact as to whether the benefits for which they contracted with Health Net were disrupted. Scripps sent the letter terminating the Thompsons on June 14, 2000. Although Patricia immediately requested a transfer to a new medical group, that transfer was not effective until July 1, 2000. During the hiatus between June 14 and July 1, Patricia could not see her treating physicians for nonemergency follow-up care, including a scheduled visit with Dr. Harkey.

## II. *Negligent Infliction of Emotional Distress and Breach of Fiduciary Duty*

We reject Scripps's contention the court should have granted summary adjudication of the negligent infliction of emotional distress and breach

of fiduciary duty causes of action. The court denied the motion because the Thompsons raised a triable issue of fact as to breach, based upon the declaration of Dr. David Goldstein, the Thompsons' expert. Goldstein declared Scripps breached the standard of care and its fiduciary duty by violating the American Medical Association Code of Medical Ethics 1.3.10 and the Hippocratic Oath, because its policy is retaliatory and "promotes the self-interest of physicians over that of patients."

It has long been the law in California that a physician can lawfully abandon a patient " 'only . . . after due notice, and an ample opportunity afforded to secure the presence of other medical attendance.' " (*Payton v. Weaver* (1982) 131 Cal.App.3d 38, 45 [182 Cal.Rptr. 225], quoting *Lathrope v. Flood* (1901) 6 Cal.Unrep. 637, 639 [63 P. 1007, 1008], revd. on other grounds (1902) 135 Cal. 458 [67 P. 683]; *Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1138 [73 Cal.Rptr.2d 695] ["In the absence of the patient's consent, the physician must notify the patient he is withdrawing and allow ample opportunity to secure the presence of another physician."]; BAJI No. 6.05.)

Scripps contends that because it gave adequate notice to the Thompsons and because Health Net transferred them to UCSD Medical Group, the Thompsons did not raise a triable issue of fact as to breach. We disagree. As we discussed above, there was a two-week hiatus between the time Scripps denied the Thompsons access to its physicians for nonemergency services and the time the Thompsons were assigned to UCSD. The Thompsons raised a triable issue of fact as to whether they were given ample time to retain other physicians.

We also reject Scripps's contention it breached no duty because its contract with Health Net allows it to terminate a patient who files a lawsuit. As discussed above, Scripps failed to produce evidence that the terms and conditions of its contract with Health Net were incorporated into the contract between the Thompsons and Health Net.

### III. *Unruh Civil Rights Act*

 We agree the court erred by denying Scripps's motion for summary adjudication of the cause of action for violation of the Unruh Civil Rights Act. The court denied both parties' motions for summary adjudication because neither party addressed the theory of physical disability and medical condition discrimination.

The court's analysis is based upon an incorrect reading of the complaint. Paragraph 23 of the complaint alleges that Scripps's "*actions* were unreasonable and constitute arbitrary discrimination against Mrs. Thompson's

physical disability and medical condition . . . ." (Italics added.) Paragraph 22 of the complaint alleges that the actions that constitute the discrimination "were taken in retaliation for the underlying medical malpractice lawsuit . . . ." Those actions consist of Scripps's termination of the Thompsons as patients.

Although the complaint could be more clearly drafted, it states that the actions that constitute the discrimination are Scripps's termination of medical care for patients who file a medical malpractice suit against a Scripps physician. Further, the Thompsons explained in oral argument that both parties agreed the "cause of action under the Unruh [Civil Rights] Act is based on these people, the Thompsons, as a member of a group of patient litigants," asked the court to base its ruling on that theory, and offered to amend the complaint if it was unclear. The court erred by not modifying its tentative ruling to address the retaliatory discrimination pled in the complaint.

Because the parties agree this cause of action is based upon discrimination against patient litigants, we discuss the merits of the parties' motions for summary adjudication of this issue.[1] ▮ We adopt the clear, succinct explanation of current Unruh Civil Rights Act law stated in *Hessians Motorcycle Club v. J.C. Flanagans* (2001) 86 Cal.App.4th 833, 836 [103 Cal.Rptr.2d 552] (*Hessians*): "In addition to the particular forms of discrimination specifically outlawed by the [Unruh Civil Rights] Act (sex, race, color, etc.), courts have held the Act 'prohibit[s] discrimination based on several classifications which are not specifically enumerated in the statute.' [Citation.] These judicially recognized classifications include unconventional dress or physical appearance [citation], families with children [citation], homosexuality [citation], and persons under age 18 [citation]."

"In *Harris* [*v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142 [278 Cal.Rptr. 614, 805 P.2d 873]], the Supreme Court reexamined these earlier decisions which treated the list of statutory classifications as ' "illustrative rather than restrictive" ' [citation] and cautioned against extending the Act's reach any further. '[W]ere we writing on a clean slate, the repeated emphasis in the language of sections 51 and 52 on the specified classifications of race, sex, religion, etc., would represent a highly persuasive, if not dispositive, factor in our construction of the Act. [Citation.]' [Citation.] The court

---

[1]We reject the Thompsons' contention that we must send this issue back to the trial court to decide, under *Burke Concrete Accessories, Inc. v. Superior Court* (1970) 8 Cal.App.3d 773 [87 Cal.Rptr. 619]. The *Burke* court granted a writ of mandamus and instructed the trial court to decide the issue, where the parties had stipulated to the facts. In this case, the parties have not stipulated to the facts.

concluded 'the Legislature intended to confine the scope of the Act to the . . . types of discrimination' specifically identified in the statute. [Citation.]

"Despite this conclusion, the *Harris* court did not overrule the prior cases which extended the Act to certain nonenumerated classifications. [Citation.] The court did, however, adopt a new, narrower construction of the Act and 'made it clear *future expansion* of prohibited categories should be carefully weighed to ensure a result consistent with legislative intent. [Citations.]' [Citation.] To that end, the court engaged in a three-step inquiry in considering (and rejecting) application of the Act to 'economic' discrimination—the 'new' classification at issue in that case. [Citation.] In the wake of *Harris*, courts have consistently followed this three-part analysis when determining whether discrimination which implicates a 'new' classification is prohibited by the Act. [Citations.]" (*Hessians, supra,* 86 Cal.App.4th 833 at p. 836.)

In order to determine whether Scripps's termination of patient litigants violates the Unruh Civil Rights Act, we follow the *Harris* three-part analysis, which consists of analyzing "(1) the language of the statute, (2) the legitimate business interests of the defendants, and (3) the consequences of allowing the new discrimination claim." (*Hessians, supra,* 86 Cal.App.4th at p. 836.) We are guided by *Gayer v. Polk Gulch, Inc.* (1991) 231 Cal.App.3d 515 [282 Cal.Rptr. 556] (*Gayer*)[2]—a case decided after *Harris*—which holds that retaliatory discrimination against litigants does not violate the Unruh Act.

 We first consider the language of the statute, which states in part: "(b) All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever. [¶] (c) This section shall not be construed to confer any right or privilege on a person that is conditioned or limited by law or that is applicable alike to persons of every sex, color, race, religion, ancestry, national origin, disability, or medical condition." (Civ. Code, § 51.) In *Harris,* the court interpreted subdivision (c) to mean that a landlord can limit access to public accommodations as long as the policy "is applicable alike to all persons regardless of race, color, sex, religion, etc." (*Harris v. Capital Growth Investors XIV, supra,* 52 Cal.3d at p. 1155.) Scripps's policy also applies to all patients who sue Scripps's physicians for malpractice, irrespective of the race, color, sex, and religion of the patient.

---

[2]In *Gayer,* a bar owner refused to serve a patron who had filed a sexual orientation discrimination suit against the bar. (*Gayer, supra,* 231 Cal.App.3d at pp. 517-518.)

The *Harris* court also applied the statutory interpretation canon of *ejusdem generis* to "reconcile the plain language of the statute, including its listed discriminatory classifications, with the holdings of our prior cases and the Legislature's actions and reactions to our decisions." (*Harris v. Capital Growth Investors XIV, supra,* 52 Cal.3d at p. 1160.) It determined that the common element was "personal as opposed to economic characteristics—a person's geographical origin, physical attributes, and personal beliefs." (*Ibid.*) Scripps's policy does not rely upon a patient's personal characteristics, but upon that patient's conduct. (*Gayer, supra,* 231 Cal.App.3d at p. 525 ["filing a lawsuit is clearly conduct"].) We find, therefore, that Scripps's policy does not constitute the kind of discrimination that the Unruh Civil Rights Act was meant to preclude.

We next consider whether Scripps has a legitimate business interest in excluding patient-litigants. Under *Harris,* the critical issue is whether the challenged policy "bears a reasonable relation to commercial objectives appropriate to an enterprise serving the public . . . ." (*Harris v. Capital Growth Investors XIV, supra,* 52 Cal.3d at p. 1165.) The Thompsons contend Scripps's policy is not rationally related to Scripps's services because Scripps terminates medical care of a patient-litigant irrespective of (1) whether the patient's malpractice claim is legitimate; (2) how long the patient has been with the group and whether the patient has been compliant during that period; and (3) whether the patient's care has been transferred to Scripps's physicians who have not been sued. None of these contentions address Scripps's stated reasons for the policy—to ensure the physician-patient relationship is not compromised. Patient-litigants might color the information they disclose to a Scripps physician because they fear the information could be used in the lawsuit. Additionally, although against Scripps's policy, a Scripps physician might treat patient-litigants differently, and even if not, the patients might believe they were not getting proper care. Scripps's concerns about communication and the physician-patient relationship are reasonably related to the medical services it provides.

Last, we consider the consequences of allowing a discrimination claim by patient-litigants. We agree the analysis of the court in *Gayer*: "[A]ppellant urges that such conduct creates a class of persons who have filed lawsuits. But such logic could be applied to any kind of conduct. Were we to hold that the conduct involved here gave rise to a protected class under the Act, we would open the door for a seemingly endless stream of new cases never contemplated by the Legislature." (*Gayer, supra,* 231 Cal.App.3d at p. 525.) We find that retaliatory discrimination against patient litigants does not violate the Unruh Civil Rights Act.

We are not persuaded by the Thompson's reliance on *Vaughn v. Hugo Neu Proler International* (1990) 223 Cal.App.3d 1612 [273 Cal.Rptr. 426], which

held the Unruh Civil Rights Act was violated when a scrap metal dealer refused to deal with the plaintiff years after the plaintiff had successfully sued the dealer for sex discrimination under the Unruh Civil Rights Act. *Vaughn* was decided before *Harris* and relied upon earlier California Supreme Court cases that applied the more expansive application of the Unruh Civil Rights Act the California Supreme Court explicitly rejected in *Harris*. Further, *Vaughn* is easily distinguished: "In *Vaughn* the previous discrimination suit between the parties had been settled several years before the alleged retaliatory exclusion took place. [Citation.] The defendant in *Vaughn* could hardly argue that plaintiff was excluded because tensions between the parties were running high as the result of the pending lawsuit." (*Gayer, supra,* 231 Cal.App.3d at p. 523.) Unlike *Vaughn*, Scripps is concerned that the tensions between the parties caused by a pending lawsuit will have a negative impact on the physician-patient relationship.

## IV. *Cartwright Act*

We agree the court erred by failing to grant Scripps's motion for summary adjudication of the Cartwright Act cause of action. The Cartwright Act prohibits illegal trusts, where a "trust is a combination of capital, skill or acts by two or more persons" (a) to restrict trade or commerce, (b) to limit production or increase prices, (c) to prevent competition, (d) to fix prices; or (e) to agree to restrict prices. (Bus. & Prof. Code, § 16720.) ▮ The refusal to sell a product to a consumer violates the Cartwright Act only when (1) the refusal involves an agreement between two entities and (2) the purpose of the agreement is to restrain trade. (*Quelimane Co. v. Stewart Title Guaranty Co., supra,* 19 Cal.4th at p. 49.)

▮ The court denied Scripps's motion for summary adjudication because it found the Thompsons raised a triable issue of fact that there was an agreement between Scripps and Health Net to terminate medical care for patients who file lawsuits. We agree the Thompsons raised a triable issue of fact as to an agreement. The Cartwright Act, like the federal Sherman Act (15 U.S.C. § 1), does not proscribe independent action. (*Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 369, 371 [113 Cal.Rptr.2d 175] (*Chavez*).) To that effect, "the manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination." (*Monsanto Co. v. Spray-Rite Service Corp.* (1984) 465 U.S. 752, 761 [104 S.Ct. 1464, 1469, 79 L.Ed.2d 775].) "An unlawful combination arises, however, if the manufacturer goes beyond those measures by seeking communication of a dealer's acquiescence or agreement to secure the dealer's compliance, such as by means of coercion, and the dealer so communicates." (*Chavez*, at p. 372 [describing *Monsanto*].)

The Thompsons do not dispute that Health Net independently created its policy of allowing medical groups to transfer patient litigants. Further, Health Net does not require medical groups to terminate patient litigants: "In recognition of the fact that PPGs will have varying standards of acceptable patient behavior, the guidelines on the following page show the types of behavior which Health Net will consider as grounds for termination." On the other hand, Scripps cannot transfer a patient-litigant who is insured by Health Net without Health Net's consent. Therefore, the Thompsons have raised a triable issue of fact as to whether Scripps's action of requesting Health Net terminate the medical care of a patient litigant satisfies the requirement of a combination.

We find as a matter of law, however, the Thompsons' evidence does not show that the purpose of Scripps's policy is to restrain trade, prevent competition, or affect prices.[3] Scripps introduced evidence that the purpose of its policy is to ensure that patient care is not compromised due to a degradation of the patient-physician relationship. This evidence is sufficient to make a prima facie case that restraint of trade is not the purpose of the agreement between Scripps and Health Net. The burden then shifts to the Thompsons to present evidence to raise a triable issue of fact. The Thompsons dispute Scripps's purpose because patient-litigants are terminated from care whether or not the treating physicians believe there has been a degradation of the relationship or their ability to care for the patient. Even if the Thompsons have raised a triable issue of fact as to the reason for Scripps's policy, the evidence fails to show how trade is restrained by Scripps's policy. The Thompsons' expert, Robert C. Fellmeth, also failed to address how Scripps's policy restrains trade. Fellmeth declared that Scripps and Health Net engaged in a " 'concerted refusal to deal,' " which constitutes an unlawful trust under the Cartwright Act because "[t]he market is properly bottom-driven, with results determined by consumer demand, not dictated from above by collusive agreement."

We reject the Thompsons' contention that an illegal trust can result from a narrowing of consumer choice irrespective of a restraint on trade or a restriction of prices. They base this contention upon a misinterpretation of *Marin County Bd. of Realtors, Inc. v. Palsson* (1976) 16 Cal.3d 920 [130 Cal.Rptr. 1, 549 P.2d 833] (*Marin*). In *Marin*, the Supreme Court held that when the Marin County Board of Realtors (Board) limited access to the Multiple Listing Service (MLS) to members of the Board, the Board engaged

---

[3]The court denied the Thompsons' motion for summary adjudication because the Thompsons failed to show that the purpose of Scripps's policy was to restrain trade.

in a group boycott.[4] *Marin* concerns an horizontal boycott, which "involves the joint efforts of competitors at the same level of distribution as the plaintiff to disadvantage that competitor by denying him the tools necessary to complete." (*Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 194 [91 Cal.Rptr.2d 534].) The court found that the Board's practice "pose[d] serious anticompetitive dangers both to licensed real estate salesman and to consumers." (*Marin,* at p. 935.) It "limit[s] entry into a competitive field by making it difficult for nonmembers to compete effectively with members," which limits consumer choice and affects the price of commissions. (*Id.* at p. 937.)

Unlike the policy of the Board in *Marin,* Scripps's policy does not create an horizontal boycott because it does not disadvantage other physicians or medical groups by denying them the tools necessary to compete. The *Marin* court's statement that "[a]ntitrust laws are designed primarily to aid the consumer" (*Marin, supra,* 16 Cal.3d at p. 935), does not imply that *any* action that limits of consumer choice violates the Cartwright Act. In a case where a grocer left a large store vacant, the court explained: "[An] allegation that defendants' actions 'reduce market choices otherwise available to consumers' does not imply a diminution of competition [and thereby violate the Cartwright Act]. The same can be said of every occasion that an enterprise ceases to offer its goods or services by going out of business." (*Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 856 [128 Cal.Rptr.2d 389] (*Gregory*).) Similarly, Scripps merely withdrew its services from certain patients. We note that consumers, like the Thompsons themselves, agree to limit their choice of physicians by choosing a health maintenance organization as their medical insurance provider.

## V. *Unfair Competition and Violation of Public Policy*

Scripps contends it has not engaged in unfair competition or violated public policy because physicians have the right to withdraw from a patient's care and because patients have no right to treatment by a particular physician. The Thompsons contend Scripps's policy violates the law because it impedes a patient's right to seek redress for malpractice in the courts and violates a physician's duty to his patients. Because the same policies lie behind the unfair competition and public policy causes of action, we will discuss both through the lens of unfair competition law.

Unfair competition includes "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) "By proscribing

[4]The Thompsons also rely upon *People v. National Association of Realtors* (1981) 120 Cal.App.3d 459 [174 Cal.Rptr. 728, 22 A.L.R.4th 79], in which we followed *Marin* and held that other realtor associations that limited access to the MLS to members violated the Cartwright Act.

'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable. [Citations.] [¶] However, the law does more than just borrow. The statutory language referring to 'any unlawful, *unfair or* fraudulent' practice (italics added) makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. 'Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." ' [Citation.]" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*).)

Although the unfair competition law is broadly written to permit courts to restrain dishonest or unfair business dealings, the scope of the law is not unlimited. "Courts may not simply impose their own notions of the day as to what is fair or unfair. Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." (*Cel-Tech, supra,* 20 Cal.4th at p.182.) "If no statute provides a safe harbor, a court must determine whether the challenged conduct is unfair within the meaning of the unfair competition law." (*Id.* at p. 184.)

Scripps has not engaged in unlawful competition by violating another law. As we discussed above, Scripps has not violated the Unruh Civil Rights Act or the Cartwright Act. We reject the contention of amicus curiae Center for Public Interest Law (CPIL) that Scripps violated certain provisions of the Knox-Keene Health Care Service Plan Act of 1975 (the Knox-Keene Act) (Health & Saf. Code, § 1340 et seq.). The Knox-Keene Act applies only to health maintenance organizations and not to physician groups. (Health & Saf. Code, §§ 1343, subd. (a), 1345, subds. (f), (o).[5]) We also reject CPIL's contention that Scripps violated title 22 of the California Code of Regulations, section 53891 because that regulation governs when a

---

[5]The Knox-Keene Act applies only to "health care service plans" and "specialized health care service plan contracts," which are defined as "either of the following: [¶] (1) Any person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees. [¶] (2) Any person, whether located within or outside of this state, who solicits or contracts with a subscriber or enrollee in this state to pay for or reimburse any part of the cost of, or who undertakes to arrange or arranges for, the provision of health care services that are to be provided wholly or

Medi-Cal managed care health plan can terminate a Medi-Cal patient and so is inapplicable to Scripps.

We are not aware of, nor has Scripps pointed out, any law that provides safe harbor. Therefore, for purposes of analysis, we must determine whether Scripps's policy is unfair. Business and Professions Code, section 17200 does not define the term "unfair." One commonly used definition of an unfair practice is a practice that "offends an established public policy or . . . is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." (*People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 530 [206 Cal.Rptr. 164, 53 A.L.R.4th 661].) Another commonly used test is as follows: "[T]he determination of whether a particular business practice is unfair necessarily involves an examination of its impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim—a weighing process quite similar to the one enjoined on us by the law of nuisance." (*Motors, Inc. v. Times Mirror Co.* (1980) 102 Cal.App.3d 735, 740 [162 Cal.Rptr. 543] (*Motors*).)

In *Cel-Tech*, the California Supreme Court criticized these definitions: "We believe these definitions are too amorphous and provide too little guidance to courts and businesses. Vague references to 'public policy,' for example, provide little real guidance. ' "[P]ublic policy" as a concept is notoriously resistant to precise definition, and . . . courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, "lest they mistake their own predilections for public policy which deserves recognition at law." ' [Citation.] These concerns led us to hold that to establish the tort of wrongful discharge in violation of public policy, the public policy triggering the violation must be tethered to a constitutional or statutory provision [citation] or a regulation carrying out statutory policy [citation]." (*Cel-Tech, supra,* 20 Cal.4th at p. 185.)

The court adopted the following test for actions in which a competitor alleges anticompetitive practices: "When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Cel-Tech*, at p. 187, fn. omitted.) However, the court limited its

in part in a foreign country in return for a prepaid or periodic charge paid by or on behalf of the subscriber or enrollee." (Health & Saf. Code, §§ 1343, subd. (a), 1345, subd. (f).)

holding to such actions: "Nothing we say relates to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law . . . ." (*Id.* at p. 187, fn. 12.)

*Cel-Tech* has left it unclear whether we still rely upon the earlier definitions of "unfair," which it criticized. We agree with the *Gregory* court, which found that *Cel-Tech* narrowed the expansive earlier interpretations of the term "unfair": "*Cel-Tech*, however, may signal a narrower interpretation of the prohibition of unfair acts or practices in all unfair competition actions and provides reason for caution in relying on the broad language in earlier decisions that the court found to be 'too amorphous.' Moreover, where a claim of an unfair act or practice is predicated on public policy, we read *Cel-Tech* to require that the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions." (*Gregory, supra,* 104 Cal.App.4th at p. 854, fn. omitted; but see *Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 720-721, fn. 23 [113 Cal.Rptr.2d 399].)

The Thompsons and CPIL contend Scripps's policy is unfair because it impedes a patient's right to sue for malpractice. We agree the right to seek redress in the courts is a constitutional right, which is grounded "in the Article IV Privileges and Immunities Clause [citations], the First Amendment Petition Clause [citations], the Fifth Amendment Due Process Clause [citations], and the Fourteenth Amendment Equal Protection [citations] and Due Process Clauses [citations]." (*Christopher v. Harbury* (2002) 536 U.S. 403, 415, fn. 12 [122 S.Ct. 2179, 2186, 153 L.Ed.2d 413].) It is also guaranteed by article I, section 3 of the California Constitution. (*Wolfgram v. Wells Fargo Bank* (1997) 53 Cal.App.4th 43, 52-53 [61 Cal.Rptr.2d 694].) We do not agree, however, that Scripps's policy prevents a patient from filing a malpractice action. Scripps does not interfere with the malpractice action; it merely chooses not to treat the litigants once the decision to litigate has been communicated to Scripps.

The right upon which the Thompsons and CPIL actually rely is a patient's right to continuity of care from a physician of her choosing. But there is no such right. The physician-patient relationship is a contractual one. (*McNamara v. Emmons* (1939) 36 Cal.App.2d 199, 204-205 [97 P.2d 503]; *Ranier v. Grossman* (1973) 31 Cal.App.3d 539, 543 [107 Cal.Rptr. 469].) As we discussed above, a physician can lawfully withdraw from treating a patient after notice and a reasonable time to secure another physician. (*Payton v. Weaver* (1982) 131 Cal.App.3d 38, 45 [182 Cal.Rptr. 225]; BAJI No. 6.05.) Dr. Goldstein, the Thompsons' expert, admitted that a physician can withdraw for no reason at all.

Relying upon the balancing test of *Motors, supra,* 102 Cal.App.3d 735, the Thompsons and CPIL also contend Scripps's policy is unfair because physicians' obligation to patients outweighs physicians' loyalty to colleagues. The Thompsons rely on the Hippocratic Oath[6] and the American Medical Association Principles of Medical Ethics (Ethics) for their contention that physicians' duty to patients is paramount. Ethics does not support the Thompsons' position because it states both principles: (1) "A physician shall, while caring for a patient, regard responsibility to the patient as paramount"; and (2) "A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical care." Scripps's policy incorporates both principles by ensuring that patients who are in emergency situations are not transferred until their condition has stabilized. Although we agree physicians have a duty of loyalty to patients, that duty is not always paramount. For example, we held that in a patient's malpractice action, his physician could testify as an expert for the defense. (*Torres v. Superior Court, supra,* 221 Cal.App.3d 181, disapproved on other grounds in *Heller v. Norcal Mutual Ins. Co.*(1994) 8 Cal.4th 30, 41 [32 Cal.Rptr.2d 200, 876 P.2d 999].) Even if we were inclined to determine that physicians' duty to patients outweighs the duty to colleagues, we would not do so. ■ As directed by the Supreme Court in *Cel-Tech*: In "determin[ing] whether the challenged conduct is unfair within the meaning of the unfair competition law . . . , courts may not apply purely subjective notions of fairness. 'The appellate courts have "neither the power nor the duty to determine the wisdom of any economic policy; that function rests solely with the legislature. . . ." [Citation.]' " (*Cel-Tech, supra,* 20 Cal.4th at p. 184.)

■ We decline to consider the Thompsons' and CPIL's contentions that are not at issue in this case. Although Scripps has admitted that when a patient sues, Scripps transfers all members of the patient's family, Scripps did not apply that policy in this case because both the Thompsons were plaintiffs in the malpractice action. We also decline to determine whether a policy like the one adopted by Scripps would be lawful in a community or area where physicians are scarce. Scripps treats patients in San Diego, which has an abundance of physicians. Further, the Thompsons were transferred to UCSD and admitted they received excellent care by the UCSD physicians. For these reasons, we find the court erred by not granting summary adjudication of the unfair competition and public policy causes of action.

---

[6]The Hippocratic Oath provides " ' "The regimen I adopt shall be for the benefit of my patients ·according to my ability and judgment, and not for their hurt or for any wrong." ' [Citation.]" (*Torres v. Superior Court* (1990) 221 Cal.App.3d 181, 186 [270 Cal.Rptr. 401], italics omitted.)

## VI. *Punitive Damages*

We agree the court erred by denying Scripps's motion for summary adjudication of the punitive damage claims, based upon the Thompsons failure to comply with Code of Civil Procedure section 425.13. Code of Civil Procedure section 425.13, subdivision (a) provides in part: "In any action for damages arising out of the professional negligence of a health care provider, no claim for punitive damages shall be included in a complaint or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed." Although the statute uses the term "negligence," it is well established that intentional torts may fall within the scope of the statute. (*Central Pathology Service Medical Clinic, Inc. v. Superior Court* (1992) 3 Cal.4th 181, 191 [10 Cal.Rptr.2d 208, 832 P.2d 924] (*Central Pathology*).)

The Thompsons contend the statute does not cover the termination of their medical care by Scripps because it was an administrative action, rather than an action performed in Scripps's capacity as a health care provider. The trial court agreed.

As a matter of law, we conclude Scripps's termination of medical care for the Thompsons arose from its professional capacity as a health care provider. To begin, Scripps is a health care provider, governed by a group of representative physicians. Scripps's governing physicians established the policy of terminating further care of patient litigants because a lawsuit "irreparably compromises the physician-patient relationship, thereby potentially compromising the care rendered to the patient."

We next determine whether Scripps's termination of medical care for the Thompsons arose in the context of professional negligence. "[A]n action for damages arises out of the professional negligence of a health care provider if the injury for which damages are sought is directly related to the professional services provided by the health care provider." (*Central Pathology, supra*, 3 Cal.4th at p. 191.) We recently held that a medical group's denial of a patient's request for an expensive prosthesis after a utilization review was a professional medical decision, rather than a purely administrative or economic decision. (*Palmer v. Superior Court* (2002) 103 Cal.App.4th 953, 972 [127 Cal.Rptr.2d 252].) We further held that a physician's statements to pressure the patient not to appeal the medical group's decision—although "outside [the physician's] normal health care provider role"—"still fall within the context of professional medical negligence." (*Id.* at p. 972-973.) Similarly, a decision to withdraw from the treatment of a patient is a medical decision, not an administrative decision, which falls within the context of

medical negligence because it is a decision that occurs during medical treatment and is governed by the law of abandonment. (See, e.g., BAJI No. 6.05.)

Alternatively, we conclude that under the doctrine of judicial estoppel, the Thompsons are precluded from relying upon that contention. The Thompsons' position in their opposition to Scripps's motion for summary judgment claims Scripps violated a physician's professional duty of care by withdrawing its services from patient litigants. The Thompsons specifically contend that Scripps as a clinic owed the Thompsons this duty based upon both the Hippocratic Oath and the Ethics and that Scripps's decision adopting the policy of terminating patient litigants breached that duty. The Thompsons cannot argue at the same time that the decision was not a professional, but an administrative, one.

" 'Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding. The doctrine serves a clear purpose: to protect the integrity of the judicial process.' [Citation.]" (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181 [70 Cal.Rptr.2d 96].) Judicial estoppel applies where: "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." (*Id.* at p. 183.)

Each of the elements of the test for judicial estoppel is met in this case. The Thompsons have taken two totally inconsistent positions: the termination violates the professional duty of care and the termination is an administrative, not a professional decision. These positions were taken not only in the same judicial proceeding, but in the same document—the opposition to Scripps's motion for summary judgment. The Thompsons were successful in asserting the position that the termination of a patient is part of a physician's professional duty of care because we affirm the trial court's denial of Scripps's motion for summary adjudication of the negligent infliction of emotional distress and breach of fiduciary duty causes of action. Finally, the Thompsons did not take the position that Scripps violated its professional duty of care out of ignorance, fraud or mistake.

DISPOSITION

Let a writ of mandate issue directing the Superior Court of San Diego County to vacate the portion of its order of July 9, 2002, denying summary

adjudication of punitive damages and of the Unruh Civil Rights Act, the Cartwright Act, the unfair competition and the breach of public policy causes of action and to enter an order granting summary adjudication of punitive damages and the Unruh Civil Rights Act, the Cartwright Act, the unfair competition and the breach of public policy causes of action. The stay issued by this court on August 21, 2002, is vacated. Each party is to bear its own costs on the order to show cause.

Huffman, Acting P. J., and McDonald, J., concurred.

A petition for a rehearing was denied June 13, 2003, and the petition of real parties in interest for review by the Supreme Court was denied September 17, 2003. Kennard, J., did not participate therein.